UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOHN DOE,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>ONE SOURCE TECHNOLOGY, LLC<br>d/b/a ASURINT,<br><br>　　　　　Defendant. | Case No.<br><br><br>**JURY TRIAL DEMANDED**<br><br><br>**DATED:** |

## COMPLAINT

John Doe ("Plaintiff" or "Mr. Doe") by and through his counsel brings the following Complaint against One Source Technology, LLC d/b/a Asurint ("Defendant" or "Asurint") for violations of the federal Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et seq.*, arising out of an employment background check report that Defendant published to Plaintiff's employer, which inaccurately reported criminal records that were pardoned (expunged) and should not have been reported.

## INTRODUCTION

1. This is an individual action for damages, costs, and attorney's fees brought against Defendant pursuant to the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, *et seq.* ("FCRA").

2. Defendant is a consumer reporting agency that compiles and maintains files on consumers on a nationwide basis. It sells consumer reports generated from its database and furnishes these consumer reports to employers who use the reports to make decisions regarding whether to offer employment to certain consumers.

1

3. Defendant inaccurately reported to Plaintiff's employer numerous criminal convictions from which Plaintiff was granted Absolute Pardons. Defendant's reporting is grossly inaccurate and untrue.

4. In Connecticut, once an individual's petition for an Absolute Pardon has been granted, that individual can legally state that they were never convicted of the pardoned crime.[1] An Absolute Pardon is also known as an expungement/erasure/full pardon.[2]

5. Accordingly, any criminal records given Absolute Pardons should **not** be reported on a consumer's background check report.

6. Defendant's inaccurate reporting could have easily been avoided had Defendant performed a cursory review of the widely available underlying public court records from Connecticut prior to publishing Plaintiff's report to his prospective employer.

7. Had Defendant performed even a cursory review of the underlying public court records, it would have discovered that the criminal records were erased from the public record and therefore, were not reportable on any employment purposed consumer report.

8. Defendant does not employ reasonable procedures to assure the maximum possible accuracy of the information it reports regarding consumers. Defendant's failure to employ reasonable procedures resulted in Plaintiff's report being grossly inaccurate.

9. Defendant committed these violations pursuant to its standard policies and practices, which harm innocent consumers seeking employment by prejudicing their prospective employers with inaccurate criminal record information.

---

[1] *See* CONN. GEN. STAT. § 54-142a (Formerly § 54-90) (2022); *see also Pardon FAQs*, ST. OF CONN. BD. OF PARDONS & PAROLES, https://portal.ct.gov/BOPP/Pardon-Division/Pardon/Pardon-FAQs (last accessed Aug. 22, 2023).
[2] *Id*.

10. As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, fear of loss of employment opportunities, wages, and benefits; fear of loss of economic opportunities and positions and advancements in the future; loss of time trying to correct his background check report; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; damage to his reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

11. As a result of Defendant's conduct, action, and inaction, Plaintiff brings claims against Defendant for failing to follow reasonable procedures to assure maximum possible accuracy based on 15 U.S.C. § 1681e(b) of the FCRA.

## PARTIES

12. John Doe ("Plaintiff" or "Mr. Doe") is a natural person residing in Waterbury, Connecticut, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

13. Defendant One Source Technology, LLC, d/b/a Asurint ("Defendant" or "Asurint") is a Delaware corporation doing business throughout the United States, including the State of Connecticut and in this District, and has a principal place of business located at 1501 Euclid Avenue, Suite 900, Cleveland, Ohio 44115. Asurint can be served through its Registered Agent, Corporation Service Company, located at 251 Little Falls Drive, Wilmington, Delaware 19808.

14. Among other things, Defendant sells background checks to employers for their use in deciding whether to offer employment to prospective employees or to take adverse action such as termination, failure to hire, or failure to promote. These reports are provided in connection with a business transaction initiated by the employer.

15. Defendant is a consumer reporting agency as defined in 15 U.S.C. § 1681a(f) because for monetary fees, it regularly engages in the practice of evaluating and/or assembling information on consumers for the purpose of furnishing consumer reports for employment purposes to third parties, and uses interstate commerce, including the Internet, for the purpose of preparing and furnishing such consumer reports.

## JURISDICTION AND VENUE

16. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

17. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## STATUTORY BACKGROUND

18. Enacted in 1970, the FCRA's passage was driven in part by two related concerns: first, that consumer reports were playing a central role in people's lives at crucial moments, such as when they applied for a job or credit, and when they applied for housing. Second, despite their importance, consumer reports were unregulated and had widespread errors and inaccuracies.

19. While recognizing that consumer reports play an important role in the economy, Congress wanted consumer reports to be "fair and equitable to the consumer" and to ensure "the confidentiality, accuracy, relevancy, and proper utilization" of consumer reports. 15 U.S.C. § 1681.

20. Congress, concerned about inaccuracies in consumer reports, specifically required consumer reporting agencies to follow "reasonable procedures to assure maximum possible accuracy" in consumer reports. 15 U.S.C. § 1681e(b).

21. Consumer reports that contain factually incorrect information which does not belong to the consumer at issue are neither maximally accurate nor fair to the consumers who are the subjects of such reports.

### THE FCRA'S PROTECTIONS FOR JOB APPLICANTS

22. Despite its name, the Fair Credit Reporting Act covers more than just credit reporting, it also regulates employment background check reports like the one Defendant prepared in Plaintiff's name.

23. The FCRA provides a number of protections for job applicants who are the subject of background checks for purposes of securing employment, housing, and other purposes.

24. In the parlance of the FCRA, background checks are "consumer reports," and providers of background checks, like Defendant, are "consumer reporting agencies." 15 U.S.C. §§ 1681a(d) and (f).

25. The FCRA imposes duties on consumer reporting agencies to assure that consumer reports are accurate and that "consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681.

26. Under 15 U.S.C. § 1681e(b), consumer reporting agencies are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

27. Defendant disregarded its duties under the FCRA with respect to Plaintiff's background check report.

## DEFENDANT'S ILLEGAL BUSINESS PRACTICES

28. Over the past 15 years, there has been increased collection and aggregation of consumer data, including criminal records and sex offender registration data. As a result of the increasing availability of this data, there has been a boom in the background check industry.

29. As summarized in a recent report by the Consumer Financial Protection Bureau[3], a 2018 survey of employers found that 95 percent of employers surveyed conducted one or more types of background screening. CFPB Report at 4.

30. The criminal background check industry takes in revenues in excess of three billion dollars, annually.[4]

31. Criminal background checks are generally created by running automated searches through giant databases of aggregated criminal record data. The reports are created and disseminated with little to no manual, in-person review, and the underlying court records are rarely directly reviewed in creating criminal background checks.

32. Background check companies, like Defendant, collect millions of criminal records from a number of sources with data from county, state, and federal level sources. The data included on the reports is often not obtained directly from court records on an individual basis but instead is purchased in bulk or scraped from court websites.

33. Given that Defendant is in the business of selling background checks, Defendant should be well aware of the FCRA and the attendant harm to consumers for reporting inaccurate or outdated information.

---

[3] CFPB, Market Snapshot: Background Screening Reports (Oct. 2019), https://files.consumerfinance.gov/f/documents/201909_cfpb_market-snapshot-background-screening_report.pdf ("CFPB Report").

[4] IBISWorld, Inc., *Background Check Services in the US: Report Snapshot*, available at http://www.ibisworld.com/industry/background-check-services.html.

34. Defendant places its business interests above the rights of consumers and reports such inaccurate information because it is cheaper for Defendant to produce reports containing information that is inaccurate and incomplete than it is for Defendant to exert proper quality control over the reports prior to their being provided to Defendant's customers.

35. Defendant reports such erroneous and incomplete information because it wants to maximize the automation of its report creation process, thereby saving the costs associated with conducting the additional review necessary to remove the inaccurate or out-of-date entries.

36. Defendant charges its customers the same price for reports that are grossly inaccurate as it does for accurate reports.

37. Appropriate quality control review of Plaintiff's report would have made clear that Defendant was reporting criminal records that were pardoned (expunged) and should not have been reported on Plaintiff's employment purposed consumer report.

38. As a provider of background check reports, Defendant should be aware of the FCRA requirements and is a member of the Professional Background Screening Association ("PBSA").  PBSA hosts a conference at least once a year where presenters discuss compliance with federal and state consumer reporting laws.

## FACTS
### Plaintiff Applies for a Job with PODS Enterprises

39. In or around June 2023, Plaintiff applied for full-time employment as a truck driver with PODS Enterprises ("PODS").

40. Upon applying to PODS, Plaintiff successfully completed an interview.

41. In or around June 2023, PODS extended a job offer to Plaintiff for the position to which he applied. The job offer was conditioned upon Plaintiff passing a background check ("employment report.")

**Defendant Published an Inaccurate Background Check Report to PODS**

42. PODS contracted with Defendant to conduct background checks, including criminal background checks, on its prospective employees.

43. On or about June 9, 2023, PODS ordered a criminal background check on Plaintiff from Defendant.

44. On or about July 5, 2023, in accordance with its standard procedures, Defendant completed its employment report about Plaintiff and sold the same to PODS.

45. Within that employment report, Defendant published inaccurate information about Plaintiff.

46. Specifically, Defendant reported eight separate criminal cases from Connecticut within Plaintiff's employment report.

47. Defendant's employment report about Plaintiff was grossly inaccurate and stigmatizing because Plaintiff had been granted Absolute Pardons for those cases on December 9, 2022.

48. In Connecticut, once an individual has been granted Absolute Pardons, it is as if the individual was never convicted of the pardoned crimes. Further, any criminal records are expunged or erased from the public record and are no longer accessible.

49. Once Plaintiff's Absolute Pardons were granted on December 9, 2022, the criminal records were expunged/erased from public access, and Plaintiff could now legally state that he was never convicted of these crimes and that he has no criminal convictions.

50. Accordingly, the convictions should no longer appear in any employment purposed consumer reports concerning Plaintiff.

51. Defendant's reporting of the pardoned (expunged) criminal records is inaccurate and harmful to Plaintiff.

52. It is entirely unclear how Defendant obtained these criminal records in the first place as they were automatically erased from public view by operation of Connecticut state law once the Absolute Pardons had been granted.

53. A cursory review of the widely available underlying public court records confirms that the criminal convictions reported by Defendant have been expunged or erased from the public records.

54. The sole reason the pardoned criminal convictions were reported on Plaintiff's employment purposed consumer report was that Defendant failed to follow reasonable procedures to assure the maximum possible accuracy of the information it published within the employment report it sold about Plaintiff to Plaintiff's prospective employer.

55. Had Defendant followed reasonable procedures, it would have discovered that Plaintiff's criminal records were pardoned (expunged) and that it should not have reported the same.

56. In preparing and selling a consumer report about Plaintiff, wherein Defendant published to Plaintiff's prospective employer inaccurate information about Plaintiff, Defendant failed to follow reasonable procedures to assure that the report was as accurate as maximally possible, in violation of 15 U.S.C. § 1681e(b).

**Plaintiff's Employment With PODS**

57. On or about June 19, 2023, Plaintiff began working for PODS, despite still waiting for his background check to be completed by Defendant.

58. On or about July 7, 2023, after PODS received Plaintiff's employment purposed consumer report from Defendant, Plaintiff was contacted by a PODS human resources representative ("PODS HR").

9

59.     PODS HR informed Plaintiff that it had received his background report and voiced concern about numerous criminal convictions that were on the report.

60.     Plaintiff was shocked; the criminal records had been pardoned (expunged) and should not have been available to anyone.

61.     Defendant's inaccurate reporting forced Plaintiff to have to defend himself and explain away criminal records that should never have been published to PODS in the first place.

62.     Plaintiff explained to PODS HR that the criminal records were pardoned.

63.     Plaintiff was very panicked, confused, and concerned about the impact of the inaccurate reporting of the pardoned (expunged) criminal records, both in relation to the PODS position, but also the impact of the same on his future.

64.     Plaintiff was also concerned that PODS HR may convey this information to other individuals, including his supervisor(s) and colleague(s).

**Plaintiff Disputed the Misinformation in Defendant's Employment Report**

65.     On or about July 14, 2023, desperate to maintain his employment with PODS and riddled with worry over the far-reaching impacts of the inaccurate information, Plaintiff disputed the inaccurate information with Defendant.  Plaintiff disputed via telephone with Defendant.

66.     Plaintiff identified himself and provided information to Defendant to support his dispute.

67.     Plaintiff disputed the inaccurate reporting of the pardoned (expunged) criminal convictions that should never have been reported in the first place.

68.     Plaintiff specifically asked Defendant to investigate and correct its reporting in any employment report about Plaintiff.

69. Plaintiff also provided Defendant with a copy of his driver's license, SSN card, and the certificate of pardon via email.

70. On July 21, 2023, Defendant responded to Plaintiff's dispute confirming that it had reinvestigated Plaintiff's dispute and conceded its inaccurate reporting by removing the criminal records from Plaintiff's background check report.

71. Defendant also communicated to Plaintiff that it had issued a corrected employment report to PODS.

72. Fortunately, Plaintiff was able to maintain his employment with PODS. However, Plaintiff is frequently consumed by the inaccurate reporting, wondering how many of his colleagues know about his pardoned criminal history. Plaintiff is constantly on edge and is also worried that if he makes the slightest mistake, that PODS will use the inaccurate report against him.

73. Defendant disseminated criminal record information that had been expunged and erased from the public record to PODS. PODS should never have been made privy to this information in the first place as Plaintiff was granted Absolute Pardons for the criminal convictions at issue.

74. Defendant's false report nearly cost Plaintiff a promising, well-paying job with PODS.

75. Plaintiff is also very much concerned that should he apply to other jobs in the future, that the inaccurate reporting will reappear and cost Plaintiff employment opportunities.

76. Plaintiff is also embarrassed and humiliated by the inaccurate reporting. Plaintiff worked very hard to move on from his past and to provide a better life for his two daughters. He had specifically waited until after his pardons were granted before applying for new employment.

Defendant's inaccurate reporting made Plaintiff feel as though all of his hard work were for nothing.

77. The injuries suffered by Plaintiff as a direct result of Defendant's erroneous reporting are the type of injuries that the FCRA was enacted to address. Under common law, Defendant's conduct would have given rise to causes of action based on defamation and invasion of privacy.

78. As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, fear of loss of employment opportunities, wages, and benefits; fear of loss of economic opportunities and positions and advancements in the future; loss of time and money trying to correct his background check report; damage to his reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

**CLAIMS FOR RELIEF**

**COUNT I**
**15 U.S.C. § 1681e(b)**
**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy**

79. Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully stated herein.

80. Defendant is a "consumer reporting agency" as defined by 15 U.S.C. § 1681a(f).

81. At all times pertinent hereto, Plaintiff was a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

82. At all times pertinent hereto, the above-mentioned employment report was a "consumer report" as that term is defined by 15 U.S.C. § 1681a(d).

83. Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to "follow reasonable procedures to assure maximum possible accuracy" in the preparation of the employment report it sold about Plaintiff as well as the information it published within the same.

84. As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, fear of loss of employment opportunities, wages, and benefits; fear of loss of economic opportunities and positions and advancements in the future; loss of time and money trying to correct his background check report; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; damage to his reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

85. Defendant willfully violated 15 U.S.C. § 1681e(b) in that its conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

86. Plaintiff is entitled to recover statutory damages, punitive damages, and reasonable attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

i. Determining that Defendant negligently and/or willfully violated the FCRA;

ii. Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii. Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

iv. Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

Dated: August 29, 2023

*/s/ McKenzie Czabaj*
McKenzie Czabaj, CT31489
**CONSUMER ATTORNEYS PLC**
8245 N. 85th Way
Scottsdale, AZ 85258
T: 480-626-2376
F: 718-715-1750
E: mczabaj@consumerattorneys.com

*Attorney for Plaintiff*
*John Doe*